IN THE SUPREME COURT OF TEXAS








IN THE SUPREME 
COURT OF TEXAS
════════════
No. 06-0911
════════════
Edwards Aquifer 
Authority et al., Petitioners,
v.
Chemical Lime, Ltd., 
Respondent
════════════════════════════════════════════════════
On 
Petition for Review from the
Court of Appeals for the Third District of 
Texas
════════════════════════════════════════════════════
 
Argued April 1, 
2008
 
 
            
Justice Hecht delivered the 
opinion of the Court, in which Chief 
Justice Jefferson, Justice O’Neill, Justice Wainwright, Justice Brister, Justice 
Medina, Justice Green, Justice Johnson and Justice Willett joined.
 
            
Justice Brister filed a 
concurring opinion.
 
            
Justice Willett filed a 
concurring opinion.
 
 
            
Whether, as a general matter, an appellate court’s decision takes effect 
the moment the court issues its opinion, order, or judgment, or later when 
rehearing is denied or the time for rehearing expires, or still later when the 
clerk issues the mandate, is a difficult question under Texas law and procedure, 
as reflected by the competing arguments in Justice Brister’s and Justice Willett’s separate opinions, and one 
we need not answer today. We all agree that if an appellate court expressly 
states the time for its decision to take effect, that 
statement controls. That rule applies here.
            
In Barshop v. Medina County 
Underground Water Conservation District, we prescribed a filing deadline 
“six months after the [Edwards Aquifer] Authority becomes effective”.[1] As it happened, the Authority began 
operations the day we issued our opinion and thus became effective. The deadline 
was set at six months from that date. We hold that the Authority correctly 
applied Barshop, and therefore we reverse the 
judgment of the court of appeals.[2] We remand the case to the trial court for 
further proceedings.
I
            
The Edwards Aquifer is an underground layer of porous, water-bearing 
rock, 300-700 feet thick, and five to forty miles wide at the surface, that stretches in an arced curve from Brackettville, 
120 miles west of San Antonio, to Austin. It is the primary source of water for 
south central Texas and therefore vital to the residents, industry, and ecology 
of the region, the State’s economy, and the public welfare.
            
Record droughts in the early 1950s prompted the Legislature to create the 
Edwards Underground Water District in 1959[3] “for the purpose of conserving, 
protecting and recharging the [aquifer’s] underground water-bearing formations . 
. . and for the prevention of waste and pollution”.[4] Although the District’s powers were 
broadened over the years, it still lacked the regulatory authority the 
Legislature came to believe was essential. In 1993, the Legislature passed the 
Edwards Aquifer Authority Act (EAAA),[5] which replaced the District with the 
Edwards Aquifer Authority, giving the Authority broad powers “for the effective 
control of the resource to protect terrestrial and aquatic life, domestic and 
municipal water supplies, the operation of existing industries, and the economic 
development of the state.”[6] The EAAA also expanded the covered 
territory.
            
The EAAA prohibits withdrawals of water from the aquifer without a permit 
issued by the Authority,[7] limits the total permitted withdrawals 
per calendar year,[8] and gives preference to “existing 
user[s]” — defined as persons who “withdr[ew] and beneficially used underground water from the aquifer 
on or before June 1, 1993.”[9] With few exceptions, water may not be 
withdrawn from the aquifer through wells drilled after June 1, 1993.[10] A permit applicant must file with the 
Authority on a prescribed form[11] a “declaration of historical use of 
underground water withdrawn from the aquifer during the historical period from 
June 1, 1972, through May 31, 1993.”[12] Subject to the limit on total 
withdrawals of water from the aquifer, an existing user who files a declaration 
“as required”, pays an application fee (set at $25), and “establishes by 
convincing evidence beneficial use of underground water from the aquifer”[13] is entitled to “a permit for withdrawal 
of an amount of water equal to the user's maximum beneficial use of water 
without waste during any one calendar year of the historical period.”[14] After existing users’ applications have 
been processed, the Authority may issue additional permits up to the cap on 
total annual withdrawals.[15] The Authority’s board of directors is 
required to “adopt rules necessary to carry out the authority’s powers and 
duties . . . , including rules governing procedures of the board and 
authority.”[16]
            
The EAAA was enacted May 30, 1993. The Authority was to commence 
operations September 1, 1993, the general effective date of the statute, but the 
new regulatory scheme was to be phased in over six months.[17] Existing users had until March 1, 1994, 
to file permit applications,[18] at which point the permit requirement 
would take effect. After March 1, a filer could generally continue to withdraw 
water pending approval of its application.[19]
            
But implementation of the EAAA was delayed. Prior to September 1, 1993, 
the United States Department of Justice refused administrative preclearance for the new Authority under section 5 of the 
Voting Rights Act of 1965.[20] On May 29, 1995, the Legislature amended 
the EAAA to meet the Department’s objections, and the Department granted preclearance. The amended statute was to be effective August 
28, 1995,[21] but on August 22, a group of landowners 
and others sued for a declaration that the EAAA was facially unconstitutional. 
The district court issued a temporary restraining order the same day prohibiting 
the Authority from beginning operations. On November 27, 1995, the district 
court rendered judgment declaring the EAAA unconstitutional and permanently 
enjoining implementation of its provisions. But on direct appeal, this Court in 
Barshop v. Medina County Underground Water 
Conservation District held that the EAAA was not unconstitutional on its 
face and therefore reversed the district court’s judgment, dissolved the 
injunction, and remanded the case to determine whether attorney fees should be 
awarded.[22] We issued our opinion and judgment on 
June 28, 1996, denied rehearing on August 16, 1996, and issued our mandate on 
February 10, 1997.
            
The Authority began operations the day our opinion issued, taking over 
all the assets, offices, personnel, and papers of the District,[23] which had continued in existence. A 
temporary board of directors appointed by the Legislature governed the Authority 
pending a November election.[24] The Authority’s activities were widely 
reported in the media because of severe drought conditions existing in south 
central Texas,[25] diverse interests competing for 
permits,[26] and a lawsuit filed by the Sierra Club 
in June 1996 in the United States District Court for the Western District of 
Texas, seeking federal judicial management of the Edwards Aquifer to protect 
endangered species. On August 23, 1996, the federal court, convinced that it was 
facing an emergency, issued a preliminary injunction imposing a plan to manage 
the aquifer. The United States Court of Appeals for the Fifth Circuit stayed the 
injunction and later reversed it on the ground that the federal court should 
have abstained to allow the Authority, which was “in the process of taking 
comments and formulating rules for permits and emergency measures”, time to 
function.[27]
            
The EAAA directed the temporary board to “adopt rules governing the 
authority” “as soon as practicable.”[28] On August 31, 1996, the Authority issued 
proposed rules to govern the process for filing a permit application, including 
a declaration of historical use.[29] The Authority set Saturday, December 28, 
1996 — six months from the date of our Barshop 
opinion — as the filing deadline.[30] In response to comments, the Authority 
moved the deadline to December 30, the following Monday.[31] With few other changes, the Authority 
adopted the proposed rules on October 31, effective November 21, 1996.[32] As the Authority explained, although the 
initial rules did not lay out a complete permitting process, the Authority 
proposed them because it “believed it needed to provide notice to existing users 
as early as possible that December 30, 1996 will be the deadline for filing 
declarations of historical use.”[33] On November 1, 1996, the Authority 
proposed further rules governing the process for reviewing permit 
applications,[34] which did not become effective until 
February 18, 1997.[35]
            
The Authority took steps to publicize the December 30 deadline as widely 
as possible. Respondent Chemical Lime, Ltd.’s 
predecessor in interest, APG Lime Corp., received a permit application form by 
mail mid-November, noticed the December 30 deadline prominently printed at the 
top of the form, and began gathering the historical data needed to submit it. 
APG’s New Braunfels plant 
had been in operation since 1907, using limestone, water, and heat to 
manufacture lime used in purifying water and controlling sulphur emissions from coal-fired plants. For twenty-five 
years, the plant had used on average some 600 acre-feet — around 200 million 
gallons — of water a year.[36] APG’s plant 
engineer, James Johnson, undertook to complete the permit application for the 
Authority but had trouble finding water usage data going back to 1972. In 
mid-December he telephoned the Authority to ask whether he could estimate water 
usage and was told he needed hard data. A few days before the deadline, he 
telephoned the Authority again to say that he would not be able to gather all 
the historical information in time. He was told that others were having 
problems, too, and that he should, as he recalled, “get 
it in when you get it — when you get that data on it.” Based on that 
conversation, Johnson believed he could submit the application late. He was not 
told that if the application was late, APG would lose its water, or that he 
could file an incomplete application by the deadline and supplement it later, 
which was the Authority’s policy.
            
APG did not file its permit until January 17, 1997. The Authority did not 
notice that it was late and continued to process it, notifying APG in April 1998 
that a permit would issue for 618.2326 acre-feet of water. In 1999, Chemical 
Lime acquired APG’s plant and its interest in the 
permit application. Not until November 2000 did the Authority notify Chemical 
Lime that the application would be denied because it was filed after the 
deadline. Chemical Lime protested, but the Authority refused to reconsider.
            
Chemical Lime sued the Authority and its general manager and directors in 
their official capacities,[37] seeking a declaration that the 
application deadline should have been set no sooner than six months from this 
Court’s denial of rehearing in Barshop, which 
would make Chemical Lime’s application timely. Alternatively, Chemical Lime 
sought a declaration that it had substantially complied with the EAAA’s permit requirements.[38] The deadline-validity issue was 
presented to the trial court on stipulated facts. The court concluded that the 
EAAA “became effective on August 16, 1996”, the date rehearing was denied in 
Barshop; that the December 30, 1996 deadline 
“established by the Authority rule . . . is not a valid, legal deadline”; that 
the proper deadline was February 16, 1997; and that Chemical Lime’s permit 
application was timely filed. The substantial-compliance issue was tried to a 
jury, which found for Chemical Lime. Based on its conclusions and the jury 
verdict, the trial court rendered judgment for Chemical Lime. The court awarded 
Chemical Lime $481,948.72 attorney fees, plus attorney fees on appeal.
            
The court of appeals affirmed but concluded that the permit application 
deadline should be six months from issuance of the mandate in Barshop, or August 10, 1997.[39] The court “express[ed] no opinion 
regarding the legal status or validity of acts performed under color of the EAA 
Act between the June 28, 1996 supreme court judgment in Barshop and the court’s issuance of its mandate” on 
February 10, 1997.[40] Having determined that Chemical Lime’s 
application was timely filed, the court did not reach Chemical Lime’s argument 
that it had substantially complied with the statutory permit requirements.[41] The court affirmed the award of attorney 
fees to Chemical Lime.[42]
            
We granted the Authority and its agents’ petition for review.[43] Because their interests are aligned, we 
refer only to the Authority in addressing their arguments.[44] The Authority contends that (1) the 
December 30, 1996 permit application filing deadline was valid, (2) by missing 
the deadline Chemical Lime failed to substantially comply with the statutory 
requirements for a permit as a matter of law, (3) chapter 36 of the Texas Water 
Code precludes an award of attorney fees to Chemical Lime under the Declaratory 
Judgment Act and requires an award of attorney fees to the Authority. We address 
these arguments in turn.[45]
II
            
To determine the validity of the Authority’s December 30, 1996 permit 
application filing deadline, we begin with our decision in Barshop. One argument in that case against the 
constitutionality of the EAAA was that it set an impossible condition for 
compliance: a March 1, 1994 filing deadline that had expired before the 
Authority had even come into existence.[46] But the Legislature had amended the EAAA 
in 1995 to meet preclearance objections so that the 
Act could take effect, yet had not changed the deadline. So the argument had to 
be, not only that the deadline set by the EAAA turned out to be impossible, but 
that the Legislature intended — given its action in 1995 — to set an 
impossible deadline, so that when the EAAA took effect, it would prohibit any 
withdrawal of water from the Edwards Aquifer by regular permit. The argument was 
that the Legislature had created a regulatory scheme to preserve a crucial 
resource that was not only destined to fail but intended to fail. We 
characterized this argument as “nonsensical” and the logical result of it 
“absurd”.[47]
            
We explained the State’s position this way:
 
            
The State urges that we should interpret the March 1, 1994 date as 
directory rather than mandatory. The State maintains that we should consider the 
intent of the Legislature and construe this date to merely require that the 
declarations be filed with the Authority six months after the eventual effective 
date of the statute. We agree with the State.[48]
 
Thus, instead 
of adopting a “too literal construction of a statute, which would prevent the 
enforcement of it according to its true intent,”[49] we took a more pragmatic approach. We 
noted that in Stephenson v. Stephenson,[50] we had held that a statutory period for 
filing an appellate transcript with the newly created courts of civil appeals 
did not begin to run until “the appellate court clerk began operations”.[51] “Similarly,” we held that “the March 1, 
1994 deadline contained in the [EAAA] was intended to provide existing users six 
months to file their declarations of historical use.”[52] Accordingly, we interpreted the EAAA “as 
requiring declarations of historical use to be filed six months after the 
Authority becomes effective.”[53]
            
Because of the prolonged delays in implementing the EAAA, it was not 
clear how long it would take the Authority to begin operations. In fact, the 
Authority took over from the District the same day our opinion in Barshop issued. The EAAA instantly transferred to the 
Authority all that was the District’s. Because the EAAA became effective 
immediately in a practical sense, the Authority read Barshop to require a filing deadline six months 
later, irrespective of further proceedings in this Court,[54] although it extended the deadline two 
days from Saturday to Monday.[55] Not only was the Authority under 
pressure to act expeditiously, it was concerned that any later deadline would be 
subject to challenge.[56]
            
Despite the fact that the Authority began operations June 28, 1996, 
Chemical Lime argues, as the court of appeals held, that the EAAA did not become 
“effective” within the meaning of Barshop until 
the mandate issued in that case on February 10, 1997. Chemical Lime points to 
Rule 18.6 of the Texas Rules of Appellate Procedure, which provides that “[t]he 
appellate court’s judgment on an appeal from an interlocutory order takes effect 
when the mandate is issued.” Chemical Lime argues that the same rule should 
apply in an appeal from a final judgment. Alternatively, Chemical Line argues 
that the EAAA did not become effective until rehearing was denied in Barshop on August 16, 1996. But none of these 
arguments find support in Barshop itself. As Chemical Lime properly 
acknowledges, Barshop’s approach to resetting 
the filing deadline was entirely pragmatic.[57] Barshop 
set a new filing deadline based not on the legal effect of some procedural 
occurrence in that case but on the practical reality of the Authority’s 
commencement of operations.
            
Further in the alternative, and focusing instead on practicalities, 
Chemical Lime argues that since the Legislature’s intent in the EAAA was, as we 
stated in Barshop, “to provide existing users 
six months to file their declarations of historical use”,[58] the period should run from the effective 
date of the Authority’s rules governing the application process — November 21, 
1996 — or at the earliest, from the date those rules were proposed — August 31, 
1996. But this is an argument, not that the Authority misconstrued Barshop, but that Barshop was wrongly decided. There is nothing to 
indicate that the inevitable delay in promulgating rules would have been any 
less had the EAAA taken effect in 1993. It was never possible for final rules to 
be in effect six months before the filing deadline. Nor did the lack of final 
rules hamper the filing process. The difficulty applicants faced lay not in any 
uncertainty over what rules would apply but in gathering the required data on 
water use. Out of more than a thousand applications the Authority received, only 
twenty-two were late, and there is no evidence that any delay was attributable 
to the promulgation of the Authority’s rules.
            
The parties have devoted much attention to the problems in determining 
when, as a general matter, an appellate court decision takes effect. The 
concurring opinions shed helpful light on these problems and strongly suggest 
that this is an aspect of Texas appellate procedure that could well benefit from 
more definite rules and procedures. We conclude, however, that this case turns 
not on when our decision in Barshop became 
effective, but when the Authority became effective. On that issue, the facts 
leave no doubt that the Authority permissibly set the permit application filing 
deadline at December 30, 1996.
III
            
The jury found that Chemical Lime substantially complied with the EAAA’s permit application requirements, and the trial court 
rendered judgment on their verdict. The Authority contends that Chemical Lime 
failed to substantially comply with the statutory requirements as a matter of 
law. The issue was not addressed by the court of appeals, but it has been 
briefed in this Court, and we elect to resolve it.
            
The doctrine of substantial compliance, though certainly familiar to the 
law, lacks comprehensive definition, so we begin with several limiting 
assumptions based on what the parties here do and do not argue. We assume, 
because the Authority does not argue to the contrary, that the EAAA does not 
require strict compliance with permit application requirements. The assumption 
is a reasonable one, since one of the EAAA’s express 
requirements is that a “declaration of historical use must be filed . . . on a form prescribed by the board [of 
directors]”,[59] though there is nothing to indicate that 
filing the same information on plain paper would require rejection of the 
application. We also assume that substantial compliance with a statute means 
compliance with its essential requirements, since the parties agreed that this 
was a correct statement of the law for the jury charge. We assume further, to 
the extent it is relevant, again because the Authority does not argue otherwise, 
that Chemical Lime tried in good faith to file its permit application by the 
deadline. Although it would seem that a person who meets essential statutory 
requirements has substantially complied, even if not acting in complete good 
faith, it is clear that a person’s good faith is not enough for substantial 
compliance when essential statutory requirements like a deadline are not met. 
Finally, since the Authority initially approved Chemical Lime’s application 
before noticing that it was late-filed, we assume that Chemical Lime complied 
with all statutory requirements except the December 30, 1996 filing deadline — 
that is, that Chemical Lime is an existing user that established by convincing 
evidence beneficial use of underground water from the aquifer during the 21-year 
period before June 1993. Since the Authority barely mentions late payment of the 
fee, the question we decide boils down to this: did the Legislature consider the 
permit application filing deadline essential to the EAAA?
            
We think the answer must be yes. To be clear, the issue is not whether 
Chemical Lime substantially complied with the filing deadline. A deadline is not 
something one can substantially comply with. A miss is as good as a mile.[60] As the United States Supreme Court has 
explained:
 
            
The notion that a filing deadline can be complied with by filing sometime 
after the deadline falls due is, to say the least, a surprising notion, and it 
is a notion without limiting principle. If 1-day late filings are acceptable, 
10-day late filings might be equally acceptable, and so on in a cascade of 
exceptions that would engulf the rule erected by the filing deadline; yet 
regardless of where the cutoff line is set, some individuals will always fall 
just on the other side of it. Filing deadlines, like statutes of limitations, 
necessarily operate harshly and arbitrarily with respect to individuals who fall 
just on the other side of them, but if the concept of a filing deadline is to 
have any content, the deadline must be enforced. Any less rigid standard would 
risk encouraging a lax attitude toward filing dates. A filing deadline cannot be 
complied with, substantially or otherwise, by filing late — even by one 
day.[61]
 
Rather, the 
issue is whether Chemical Lime substantially complied with the permit 
application process, one requirement of which was the filing deadline.
            
The importance of a fixed filing deadline is apparent in the EAAA. The Legislature picked a specific, calendar date by which 
permit applications were required to be filed. It did not delegate that 
responsibility to the Authority. It made no provision for extensions and did not 
empower the Authority to do so. Its intent that applicants strictly adhere to 
the deadline is thus fairly clear. Though it became necessary for this Court to 
reset the deadline to preserve the constitutionality of the EAAA, it was not 
necessary, nor would it have been proper, to change the character of the new 
deadline, making it less mandatory than the Legislature originally intended.
            
The need for a filing deadline, with no exceptions, is also apparent. The 
Legislature found it necessary to cap annual water withdrawals to protect the 
aquifer. Because applications would exceed the cap, with no fixed cutoff, the 
Authority would be required to constantly readjust allocations among permittees to provide for late applicants. Indeed, the 
Authority argues that if Chemical Lime’s application is deemed timely and 
approval required, all permits must be adjusted, albeit slightly (about 0.1%[62]), for total annual withdrawals from the 
aquifer to remain at the statutory limit. The Legislature could certainly have 
concluded that such readjustments should be avoided.
            
Had Chemical Lime filed an incomplete or inaccurate application, its 
argument for substantial compliance would be stronger, even though as a 
practical matter, it would make no discernible difference to the permitting 
process whether an application was amended after the deadline or filed a few 
days late. But a line must be drawn somewhere, and the Legislature was not 
required to draw it with perfect precision. Chemical Lime points out that in 
Barshop we agreed with the State that the March 
1, 1994 filing deadline in the EAAA was “directory rather than mandatory”.[63] Chemical Lime contends that the law 
permits substantial compliance with non-mandatory filing deadlines. But in Barshop, we held only that the expired deadline was 
directory because, as we have already explained, any other reading would have 
led to an absurd result. We did not suggest that a viable deadline would also be 
merely directory.
            
Although the EAAA states that a declaration of historical use “must be 
filed” by the deadline,[64] Chemical Lime argues that because the 
EAAA prescribes no penalty for late filing, the deadline should not be treated 
as mandatory. We have said that “[t]he word ‘must’ is given a mandatory meaning 
when followed by a noncompliance penalty”[65] but this does not suggest that when no 
penalty is prescribed, “must” is non-mandatory. “When the statute is silent 
[regarding the penalty for noncompliance], we have looked to its purpose for 
guidance.”[66] The EAAA does not suggest that an 
applicant can be fined for a late filing or that the water allocated should be 
reduced accordingly. The only penalty the EAAA suggests is that late 
applications will not be considered.
            
We recognize the hardship of this penalty to Chemical Lime, but we 
believe the EAAA requires a firm deadline. Chemical Lime’s late filing did not 
substantially comply with the statute’s permitting requirements.
IV
            
The trial court awarded Chemical Lime attorney fees under the Declaratory 
Judgment Act (DJA). The Authority argues that it can be sued only under chapter 
36 of the Texas Water Code, and that chapter does not provide for recovery of 
attorney fees by the plaintiff. While section 36.251 does provide for suit 
against the Authority,[67] section 36.254 states that that remedy 
“do[es] not affect other 
legal or equitable remedies that may be available.” The Authority has not 
advanced an argument why we should not take section 36.254 at its word. Nor does 
the Authority argue that the DJA permits an award of attorney fees only to a 
prevailing party, an issue on which we express no opinion.[68] The Authority does not challenge the 
reasonableness or necessity of the fees awarded by the trial court.[69] But an award must be equitable and 
just,[70] considerations addressed to the trial 
court’s discretion.[71] Now that Chemical Lime is no longer the 
prevailing party, the trial court should have the opportunity to reconsider its 
award.
            
Because the Authority has prevailed, it is entitled to attorney fees 
under section 36.066(g) of the Water Code.[72] The parties stipulated below to the 
amount of those fees.[73]
V
            
Accordingly, the court of appeals’ judgment is reversed and the case is 
remanded to the trial court for further proceedings consistent with this 
opinion.
 
_______________________
Nathan L. 
Hecht
Justice
 
Opinion delivered: June 26, 
2009







[1] 925 S.W.2d 
618, 630 (Tex. 1996).

[2] 212 S.W.3d 683 
(Tex. App.–Austin 2006) (op. on reh’g).

[3] See 
House Research Org., Bill Analysis, Tex. S.B. 1477, 73rd Leg., R.S. (1993) 
(“From 1950-1956, Texas experienced a record draught [sic], causing Comal 
Springs in New Braunfels to go dry for five months and 
reducing the flow of San Marcos Springs . . . . In response, the Edwards 
Underground Water District (EUWD) was legislatively created in 1959 to conserve, 
protect and recharge the groundwater in the five counties known as the Edwards 
Aquifer region.”).

[4] Act of April 
9, 1959, 56th Leg., R.S., ch. 99, §1, 1959 Tex. Gen. 
Laws 173, 173, as amended by Act of Apr. 12, 1979, 66th Leg., R.S., ch. 69, 1979 Tex. Gen. Laws 110; Act of May 23, 1979, 66th 
Leg., ch. 306, 1979 Tex. Gen. Laws 706; Act of May 19, 
1983, 68th Leg., R.S., ch. 1010, 1983 Tex. Gen. Laws 
5422; Act of May 29, 1987, 70th Leg., R.S., ch. 332, 
1987 Tex. Gen. Laws 1746; Act of May 29, 1987, 70th Leg., R.S., ch. 333, 1987 Tex. Gen. Laws 1747; Act of May 26, 1987, 70th 
Leg., R.S., ch. 629, 1987 Tex. Gen. Laws 2411; Act of 
May 28, 1987, 70th Leg., R.S., ch. 652, 1987 Tex. Gen. 
Laws 2457; Act of May 29, 1989, 71st Leg., R.S., ch. 
599, 1989 Tex. Gen. Laws 1988; repealed by Act of May 30, 1993, 73rd 
Leg., R.S., ch. 626, § 1.41(a), 1993 Tex. Gen. Laws 
2350, 2368.

[5] Act of May 30, 
1993, 73d Leg., R.S., ch. 626, 1993 Tex. Gen. Laws 
2350, as amended by Act of May 29, 1995, 74th Leg., R.S., ch. 261, 1995 Tex. Gen. Laws 2505; Act of May 6, 1999, 76th 
Leg., R.S., ch. 163, 1999 Tex. Gen. Laws 634; Act of 
May 27, 2001, 77th Leg., R.S., ch. 966, §§ 2.60–.62, 
6.01–.05, 2001 Tex. Gen. Laws 1991, 2021–2022, 2075–2076; Act of May 25, 2001, 
77th Leg., R.S., ch. 1192, 2001 Tex. Gen. Laws 2696; 
Act of June 1, 2003, 78th Leg., R.S., ch. 1112, § 
6.01(4), 2003 Tex. Gen. Laws 3188, 3193; Act of May 23, 2007, 80th Leg., R.S., 
ch. 510, 2007 Tex. Gen Laws 900; Act of May 28, 2007, 
80th Leg., R.S., ch. 1351, §§ 2.01–2.12, 2007 Tex. Gen 
Laws 4612, 4627–34; Act of May 28, 2007, 80th Leg. R.S., ch. 1430, §§ 12.01–12.12, 2007 Tex. Gen. Laws 5848, 5901–09; 
Act of May 21, 2009, 81st Leg., R.S., ch. __, 2009 
Tex. Gen. Laws ___ (Tex. H.B. 4762, to become effective Sept. 1, 
2009).

[6] EAAA § 
1.01.

[7] EAAA § 1.15(b) 
(“Except as provided by Sections 1.17 [“Interim Authorization”] and 1.33 [wells 
producing less than 25,000 gallons per day for domestic or livestock use] of 
this article, a person may not withdraw water from the aquifer or begin 
construction of a well or other works designed for the withdrawal of water from 
the aquifer without obtaining a permit from the authority.”); EAAA § 1.35(a) (“A 
person may not withdraw water from the aquifer except as authorized by a permit 
issued by the authority or by this article.”).

[8] Initially, the 
EAAA only capped withdrawals. EAAA § 1.14(b) (stating that, with certain 
exceptions, “for the period ending December 31, 2007, the amount of permitted 
withdrawals from the aquifer may not exceed 450,000 acre-feet of water for each 
calendar year”), repealed by Act of May 28, 2007, 80th Leg., R.S., ch. 1351, § 2.09, 2007 Tex. Gen. Laws 4612, 4634, and 
by Act of May 28, 2007, 80th Leg., R.S., ch. 1430, 
§ 12.09, 2007 Tex. Gen. Laws 5848, 5908. The EAAA now sets both the maximum and 
minimum withdrawals permitted per calendar year. Act of May 28, 2007, 80th Leg., 
R.S., ch. 1351, § 2.02, 2007 Tex. Gen. Laws 4612, 4627 
(amending EAAA § 1.14(c) to state that, with certain exceptions, “for the period 
beginning January 1, 2008, the amount of permitted withdrawals from the aquifer 
may not exceed or be less than 572,000 acre-feet of water for each calendar 
year, which is the sum of all regular permits issued or for which an application 
was filed and issuance was pending action by the authority as of January 1, 
2005"); Act of May 28, 2007, 80th Leg., R.S., ch. 
1430, § 12.02, 2007 Tex. Gen. Laws 5848, 5902 (same).

[9] EAAA § 
1.03(10).

[10] EAAA § 
1.14(e) (“The authority may not allow withdrawals from the aquifer through wells 
drilled after June 1, 1993, except additional water as provided by Subsection 
(d) and then on an interruptible basis.”), amended by Act of May 28, 
2007, 80th Leg., R.S., ch. 1351, § 2.02, 2007 Tex. 
Gen. Laws 4612, 4627 (amending EAAA § 1.14(e) to state: “The authority may not 
allow withdrawals from the aquifer through wells drilled after June 1, 1993, 
except for replacement, test, or exempt wells or to the extent that the 
authority approves an amendment to an initial regular permit to authorize a 
change in the point of withdrawal under that permit.”), and by Act of May 
28, 2007, 80th Leg., R.S., ch. 1430, § 12.02, 2007 
Tex. Gen. Laws 5848, 5902 (same).

[11] EAAA § 
1.16(b).

[12] EAAA § 
1.16(a).

[13] EAAA § 
1.16(d).

[14] EAAA § 
1.16(e).

[15] EAAA § 1.18 
states: “(a) To the extent water is available for permitting after the issuance 
of permits to existing users, the authority may issue additional regular 
permits, subject to limits on the total amount of permitted withdrawals 
determined under Section 1.14 of this article. (b) The 
authority may not consider or take action on an application relating to a 
proposed or existing well of which there is no evidence of actual beneficial use 
before June 1, 1993, until a final determination has been made on all initial 
regular permit applications submitted on or before the initial application date 
of March 1, 1994.”

[16] EAAA § 
1.11(a).

[17] Act of May 
30, 1993, 73d Leg., R.S., ch. 626, § 4.02, 1993 Tex. 
Gen. Laws 2350, 2371 (“This Act takes effect September 1, 1993, except Section 
1.35 of Article 1 takes effect March 1, 1994.”).

[18] EAAA § 
1.16(b) (“An existing user’s declaration of historical use must be filed on or 
before March 1, 1994, on a form prescribed by the board. An applicant for a 
permit must timely pay all application fees required by the 
board.”).

[19] EAAA § 
1.17.

[20] See 42 
U.S.C. § 1973c(a). The District’s governing board 
consisted of fifteen elected directors. Act of April 9, 1959, 
56th Leg., R.S., ch. 99, § 5, 1959 Tex. Gen. Laws 173, 
175. The Authority’s governing board consisted of nine appointed 
directors. EAAA § 1.09.

[21] Act of May 
29, 1995, 74th Leg., R.S., ch. 261, 1995 Tex. Gen. 
Laws 2505; see also Tex. Const. art. 
III, § 39 (“No law passed by the Legislature, except the general appropriation 
act, shall take effect or go into force until ninety days after the adjournment 
of the session at which it was enacted, unless the Legislature shall, by a vote 
of two-thirds of all the members elected to each House, otherwise direct . . . 
.”).

[22] 925 S.W.2d 618, 637-638 (Tex. 
1996).

[23] EAAA § 1.41 
states in part: “(b) All files and records of the Edwards Underground Water 
District pertaining to control, management, and operation of the district are 
transferred from the Edwards Underground Water District to the authority on the 
effective date of this article. (c) All real and personal property, leases, 
rights, contracts, staff, and obligations of the Edwards Underground Water 
District are transferred to the authority on the effective date of this article. 
(d) On September 1, 1993, all unobligated and unexpended funds of the Edwards Underground 
Water District shall be transferred to the authority.”

[24] EAAA § 
1.092(a) (“Until a board is elected as provided by this section and takes 
office, the authority is governed by a temporary board that consists of: (1) Mr. 
Phil Barshop; (2) Mr. Ralph Zendejas; (3) Mr. Mike Beldon; (4) 
Ms. Rosa Maria Gonzales; (5) Mr. John Sanders; (6) Ms. Sylvia Ruiz Mendelsohn; (7) Mr. Joe Bernal; (8) Mr. Oliver R. Martin; 
(9) Mr. A. O. Gilliam; (10) Mr. Bruce Gilleland; (11) 
Mr. Rogelio Munoz; (12) Mr. Doug Miller; (13) Ms. Paula DiFonzo; (14) Mr. Mack Martinez; (15) Ms. Jane Houghson; (16) one temporary director appointed by the South 
Central Texas Water Advisory Committee from among the members of the committee; 
and (17) one temporary director appointed jointly by the Commissioners Courts of 
Medina County and Uvalde County who must be a resident of one of those 
counties.”).

[25] See, 
e.g., Tom Dukes, Water Use from Edwards Aquifer Must Be Cut, Dallas Morning News, July 14, 1996, at 
J6 (“Pumping too much water from the Edwards during the current drought 
threatens the aquifer's water quality as well as the amount of water 
available.”); Editorial, Aquifer Pumping Rules, Austin Am.-Statesman, July 2, 1996, at 
A8 (“A severe drought has made water a precious resource in Central Texas and 
throughout the state. Now more than ever, the water in the Edwards Aquifer must 
be managed to the advantage of everyone.”); Jerry Needham, The Water 
Crisis, San Antonio 
Express-News, June 30, 1996, at A1 (“The Texas Supreme Court’s OK Friday 
for a regional authority to go to work managing the Edwards Aquifer still leaves 
the region wallowing in drought-induced water woes, but it provides a solid 
framework for problem solving, officials said Saturday.”); Texas: State 
Supremes Back Regulation of Edwards Aquifer, Greenwire, July 2, 1996 (“A recent 
drought and unregulated pumping have substantially depleted the 
aquifer.”).

[26] Needham, 
supra note 25 (“Diverse interests across the aquifer — farmers, San 
Antonio and other cities, recreational interests at aquifer-fed springs as well 
as municipal and industrial users downstream — still will be jockeying for a 
favorable share of the aquifer’s bounty through permits.”).

[27] Sierra 
Club v. City of San Antonio, 112 F.3d 789, 796 (5th Cir. 
1997).

[28] EAAA § 
1.092(d).

[29] 21 Tex. Reg. 
8401 (1996) (to be codified at 31 Tex. Admin. Code §§ 701.1-.6 and 701.11-.22) 
(proposed Aug. 26, 1996) (Edwards Aquifer Auth.).

[30] Id. at 
8402 (“The injunction [in Barshop] was 
dissolved by the Texas Supreme Court, and the Act thereby became effective, on 
June 28, 1996. . . . In keeping with the intent of the Legislature, these rules 
require the filing of declarations of historical use by December 28, 1996, the 
date six months following the actual effective date of the 
Act.”).

[31] 21 Tex. Reg. 
11377, 11381 (1996) (“The proposed rule called for a filing date of Saturday, 
December 28, 1996. After further review, the filing date has been changed to 
Monday, December 30, 1996, because the Authority believes that this date is more 
consistent with legislative intent and will avoid difficulties for applicants 
who find themselves needing to file their applications on a Saturday when the 
offices of the Authority are closed.”).

[32] Id. at 
11384.

[33] Id. at 
11379 (“There simply was not adequate time to develop a full review and hearings 
process on applications for historical use by the time the Authority believed it 
needed to publish this initial set of rules. The Authority believed it needed to 
provide notice to existing users as early as possible that December 30, 1996 
will be the deadline for filing declarations of historical use. With that goal 
in mind these rules were developed. The Authority and staff knew at the time of 
proposal that additional rules would have to be developed to complete most of 
the sections with regard to the review and hearings on applications for 
permits.”).

[34] 21 Tex. Reg. 
11071 (1996) (to be codified at 31 Tex. Admin. Code §§ 701.31-.35, 701.51-.59, 
701.71-.77, 701.91-.102, 701.121-.131, & 701.141-.147) (proposed Nov. 1, 
1996) (Edwards Aquifer Auth.).

[35] 22 Tex. Reg. 
1393, 1405 (1997).

[36] An acre-foot 
of water — 43,560 cubic feet — is equal to about 325,851 
gallons.

[37] The Authority 
acknowledges that governmental immunity from suit is waived by section 36.251 of 
the Texas Water Code, which states: “A person, firm, corporation, or association 
of persons affected by and dissatisfied with any provision or with any rule or 
order made by a district is entitled to file a suit against the district or its 
directors to challenge the validity of the law, rule, or order. The suit shall 
be filed in a court of competent jurisdiction in any county in which the 
district or any part of the district is located. The suit may only be filed 
after all administrative appeals to the district are final.” The term “district” 
includes an “authority created under . . . Section 59, Article XVI, Texas Constitution”. Tex. Water Code § 36.001(1). The Authority 
was created under that provision. EAAA § 
1.02(b).

[38] Chemical Lime 
urged other claims that are not before us, including a takings claim that was 
severed in the trial court.

[39] 212 S.W.3d 
683, 696 (Tex. App.–Austin 2006).

[40] 
Id.

[41] 
Id.

[42] Id. at 
698.

[43] 51 Tex. Sup. 
Ct. J. 329 (Jan. 25, 2008).

[44] We have 
received amicus briefs for the State of Texas and the City of San Antonio, both 
in support of reversal.

[45] The State of 
Texas, as amicus curiae, argues that, because a judgment against the State is 
always superseded by the State’s filing of a notice of appeal, the Authority had 
the discretion to implement the EAAA at any time while Barshop was pending. Thus, it argues, the December 
30, 1996 filing deadline was valid regardless of when our decision in Barshop became legally effective. Our analysis of the 
case does not require us to reach this argument, and we express no opinion on 
it.

[46] Barshop v. Medina County Underground Water Conserv. Dist., 925 S.W.2d 618, 628 (Tex. 
1996).

[47] Id. at 
629.

[48] Id. at 
628.

[49] Id. at 
629 (quoting State v. Dyer, 200 S.W.2d 813, 815 (Tex. 1947) (internal 
quotation marks omitted)).

[50] 22 S.W. 150 
(Tex. 1893).

[51] 925 S.W.2d at 630.

[52] 
Id.

[53] 
Id.

[54] 21 Tex. Reg. 
11377, 11381 (Nov. 22, 1996) (“A commenter contended that the filing date should 
be February 28, 1997, which is six months after the date the Texas Supreme Court 
issued its mandate on August 31, 1996 in Barshop v. 
Medina County Underground Water Conservation District, sending the case back to 
the trial court. The filing date stated in the rule is December 30, 1996, six months after the Texas Supreme Court dissolved the 
trial court injunction that had blocked the Act from taking effect. The staff 
adheres to the December date, because the Act became fully effective on June 28, 
1996, when the injunction was dissolved. The dissolution of the injunction was 
immediately effective, and was not delayed by subsequent procedural steps in the 
Supreme Court. The staff recommends against adopting the February date because 
it is inconsistent with the Legislature's intent to require filing of 
declarations of historical use six months after the actual effective date of the 
Act. Adopting the later date would also expose those applicants who would file 
after December 30, 1996, to litigation attacking the filings as 
untimely.”).

[55] See 
supra note 31; see Pitcock v. 
Johns, 326 S.W.2d 563, 565-566 (Tex. Civ. 
App.–Austin 1959, writ ref'd) (citing Gardner v. 
Universal Life & Accident Ins. Co., 164 S.W.2d 582 (Tex. Civ. App.–Dallas 1942, writ dism’d 
w.o.j.) and former Tex. Rev. Civ. Stat. art. 23, § 
15 (1925) (“‘Month’ means a calendar month.”), first codified as Tex. Rev. Civ. Stat. art. 3140, 
§ 10 (1879), and currently as Tex. Gov’t Code § 312.011(7)); see 
also Cambell & Son v. William G. 
Lane & Co., 25 Tex. 93 (1860); Op. Tex. Att’y 
Gen. No. 0-1492 (1939); cf. Tex. 
Gov’t Code § 311.014(b), (c) (providing that, in construing a code 
provision, “[i]f the last day of any period is a 
Saturday, Sunday, or legal holiday, the period is extended to include the next 
day that is not a Saturday, Sunday, or legal holiday.”).

[56] 21 Tex. Reg. 
at 11381.

[57] Brief for 
Respondent 5 (“The Court selected that prospective trigger date for the 
six-month clock based on Stephenson v. Stephenson, 22 S.W. 150 (Tex. 
1893), where the Court pragmatically held that a deadline for filing an 
appellate transcript did not expire before the newly-created courts of civil 
appeals were ready to accept such filings. See Barshop, 925 S.W.2d at 
630.”).

[58] 925 S.W.2d at 630.

[59] EAAA § 
1.16(b).

[60] More 
accurately: “An ynche in a misse is as good as an ell.” W. Camden, Remains Concerning Britain 
303 (2d ed. 1614). An ell was a unit of measurement used by English tailors, 
usually 45 inches.

[61] United 
States v. Locke, 471 U.S. 84, 100-101 (1985) (citation and internal 
quotation marks omitted). Justice O’Connor, concurring, opined that, because the 
Court’s prior decisions did not necessarily bar the use of equitable estoppel in those circumstances, the Court’s reversal did 
not in itself establish that the claimants would ultimately forfeit their mining 
claims, in further proceedings after remand. Id. at 110-112. In the case 
at bar, other claims remain pending in the district court, but we offer no 
opinion on the claims not before us.
 

[62] Chemical 
Lime’s temporarily approved permit for 618.2326 acre-feet would be about 
one-thousandth of the 572,000 acre-feet total annual withdrawals now permitted 
by the EAAA.

[63] Barshop v. Medina County Underground Water Conserv. Dist., 925 S.W.2d 618, 628 (Tex. 
1996).

[64] EAAA § 
1.16(b).

[65] Helena 
Chem. Co. v. Wilkins, 47 S.W.3d 486, 493 (Tex. 2001) (internal quotation 
marks omitted). See also Tex. 
Gov’t Code § 311.016(3) 
(“‘Must’ creates or recognizes a condition 
precedent.”).

[66] Hines v. 
Hash, 843 S.W.2d 464, 468 (Tex. 1992).

[67] See 
supra note 37.

[68] 
Compare Vincent v. Bank of Am., N.A., 109 S.W.3d 856, 868 (Tex. 
App.–Dallas 2003, pet. denied) (a nonprevailing party 
may recover attorney fees under the Declaratory Judgment Act), Brush v. Reata Oil & Gas Corp., 984 S.W.2d 720, 731 (Tex. 
App.–Waco 1998, pet. denied) (same), Maris v. McCraw, 902 S.W.2d 191, 194 (Tex. App.–Eastland 1995, 
writ denied) (same), and Tanglewood 
Homes Ass’n, Inc. v. Henke, 728 S.W.2d 39, 45 
(Tex. App.–Houston [1st Dist.] 1987, writ ref’d n.r.e.) (same), with City 
of Houston v. Harris County Outdoor Adver. Ass’n, 732 S.W.2d 42, 56 (Tex. App.–Houston [14th Dist.] 
1987, no writ) (stating that it is an abuse of discretion to award attorney fees 
to a party who is not entitled to declaratory relief).

[69] The trial 
court awarded Chemical Lime $481,948.72 for attorney fees incurred through 
rendition of final judgment, plus $100,000.00 for attorney fees through 
proceedings in this Court.

[70] See 
Tex. Civ. Prac. & Rem. Code § 
37.009 (“In any proceeding under this chapter, the court may award costs and 
reasonable and necessary attorney’s fees as are equitable and 
just.”).

[71] Bocquet v. Herring, 972 
S.W.2d 19, 20-21 (Tex. 1998).

[72] Tex. Water Code § 36.066(g) (“If the 
district prevails in any suit other than a suit in which it voluntarily 
intervenes, the district may seek and the court shall grant, in the same action, 
recovery for attorney's fees, costs for expert witnesses, and other costs 
incurred by the district before the court. The amount of the attorney’s fees 
shall be fixed by the court.”).

[73] The parties 
stipulated that the Authority’s reasonable attorney fees were $253,525.50 in the 
trial court and would be $100,000.00 on 
appeal.